**COMMONWEALTH of Pennsylvania**

v.

**Stephen L. ROMANSKY, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 25, 1997.

Filed Oct. 31, 1997.

Gregory H. Chelak, Milford, for appellant.

Andrea F. McKenna, Deputy Atty. Gen., Harrisburg, for the Commonwealth, appellee.

Before McEWEN, President Judge, and DEL SOLE and HESTER, JJ.

HESTER, Judge.

Steven L. Romansky appeals the February 24, 1997 order denying him PCRA relief. We hold that when the Commonwealth obtains a conviction by using uncorrected testimony that the prosecutor knows to be false, a miscarriage of justice, which no civilized society can tolerate, has occurred. Thus, we determine that appellant is eligible for relief in this second post-conviction proceeding. Further, following an exhaustive review of the evidence presented at appellant's trial, we have concluded that there is the reasonable likelihood that the false testimony may have affected the jury's verdict as to some of the charges. Hence, under the applicable case law, we are constrained to vacate those convictions and remand for a new trial.

The record reveals the following. On August 27, 1985, appellant was arrested and charged with numerous offenses in connection with three motor vehicles: a 1977 Pontiac Trans-Am, a 1979 Ford Bronco, and a 1977 GMC truck. He was charged with three counts each of receiving stolen property, removal or falsification of identification number, dealing in vehicles with removed or falsified numbers, and dealing in titles and plates for stolen vehicles, two counts of false application for certificate of title or registration, and one count of conspiracy.

On May 6, 1987, appellant was acquitted by a jury of all charges relating to the 1977 GMC truck. He also was acquitted of the count of dealing in titles and plates for stolen vehicles relating to the 1977 Pontiac Trans-Am. He was found guilty of the remaining charges. On December 17, 1987, appellant was sentenced to a total term of imprisonment of nine to eighteen years. A motion for reconsideration was filed and denied, and on direct appeal, we affirmed. Appellant filed a petition for post-conviction relief in 1990, which was denied. That denial was affirmed on appeal.

On October 10, 1996, appellant filed his second petition for post-conviction relief and alleged the following. He was denied his state and federal constitutional due process rights when the Commonwealth failed to disclose vital impeachment evidence to him. Specifically, the Commonwealth failed to disclose that an investigating grand jury had issued a presentment against its witness, Thomas Smithers, recommending prosecution for various criminal offenses, including charges involving the same 1979 Ford Bronco for which appellant was convicted. The Commonwealth failed to reveal to appellant prior to trial that it had agreed not to prosecute Smithers on the indictment in exchange for his cooperation in testifying at appellant's trial. Appellant stated that he only recently discovered the exhibits and other information revealing the existence of the grand jury presentment and the agreement.[1] Finally, appellant alleged that his due process rights to a fair trial were violated when the Commonwealth allowed Smithers to testify falsely that he never was charged with respect to the crimes at issue and that he never agreed to cooperate with authorities by testifying at appellant's trial in exchange for freedom from prosecution.

The PCRA court concluded that the Commonwealth breached its constitutional obligations by failing to reveal the existence of the agreement not to prosecute Smithers and that the Commonwealth had knowingly allowed Smithers to give false testimony by permitting him to deny the existence of the agreement on the stand. However, the PCRA court failed to grant a new trial, reasoning that Smithers's testimony was not material and that the outcome at appellant's trial would not have been different had the jury been made aware of the existence of the agreement. This appeal followed.

After a review of the relevant law, we concur with the PCRA court's analysis of the law. However, we disagree that Smithers's false testimony could not have affected the outcome at trial. We have examined all of the evidence presented at appellant's trial and conclude that there is a reasonable likelihood that the false testimony could have contributed to the verdict. Hence, we reverse and remand.

Initially, we address the question of cognizability in this second post-conviction proceeding. Our Supreme Court repeatedly has ruled:

> A second or subsequent post-conviction request for relief will not be entertained unless a strong prima facie showing is offered to demonstrate that a miscarriage of justice may have occurred. *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107 (1988). This standard is met only if petitioner can demonstrate either: (a) the proceedings resulting in his conviction were so unfair that a miscarriage of justice occurred which no civilized society can tolerate; *or* (b) he is innocent of the crimes charged. *Commonwealth v. Szuchon*, 534 Pa. 483, 486, 633 A.2d 1098, 1099–1100 (1993).

*Commonwealth v. Beasley*, 544 Pa. 554, 678 A.2d 773, 777 (1996)(emphasis added).

We believe that this case presents one of the rare instances when the above standards have been met. Herein, appellant does not posit that he is innocent; rather, he argues that when the Commonwealth uses false testimony to obtain a conviction, a miscarriage of justice has occurred. We agree.[2]

In *Commonwealth v. Hallowell*, 477 Pa. 232, 383 A.2d 909 (1978), our Supreme Court examined a situation remarkably similar to the one presented herein. Hallowell's fellow perpetrator testified against Hallowell at Hallowell's murder trial. On cross-examination, the fellow perpetrator stated that the only leniency he had been offered in exchange for his testimony was that he had been released on bail. The head of the homicide division of the district attorney's office testified similarly.

---

1. The Commonwealth does not contest this statement.

2. Since we conclude that the presentation of the false testimony, in itself, requires grant of a new trial, we need not consider whether the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the existence of the agreement not to prosecute.

Actually, however, the witness had been offered leniency at sentencing. Another assistant district attorney promised to recommend a two-to-eight-year sentence if the witness testified at Hallowell's trial and pled guilty to second degree murder. The witness was sentenced in accordance with the plea bargain after the sentencing court was informed of his cooperation at Hallowell's trial. The court concluded that the district attorney's office was "guilty of perpetrating a falsehood and a fraud upon the Court, jury and people of this Commonwealth" by permitting the false testimony to go uncorrected. It stated:

In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the United States Supreme Court confirmed the principle that "*a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.*" *Id.*, at 269, 79 S.Ct. at 1177. We have similarly held. "It is, of course, an established principle that a conviction obtained through the knowing use of materially false testimony may not stand; a prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2d 806, 810 (1977) . . .

*Id.*, 477 Pa. at 236–37, 383 A.2d at 911 (emphasis added).

The *Hallowell* court announced these principles despite the fact that there was no evidence that the assistant district attorney who prosecuted Hallowell knew of the existence of the sentencing agreement between the other assistant district attorney and the witness.

Herein, the conduct of the Commonwealth actually is more egregious, as the record establishes that the same prosecuting attorney at appellant's trial agreed not to prosecute the witness. Thus, as announced in *Hallowell*, the prosecutor committed fraud upon the court, the jury, and the people of the Commonwealth in obtaining this conviction. We therefore hold that there is a prima facie showing that the proceedings resulting in appellant's conviction were so unfair that a miscarriage of justice which no civi-

lized society can tolerate may have occurred, and appellant's claim is cognizable even though raised in a second post-conviction petition.

We now address the substantive issue presented herein. The record establishes that on May 15, 1985, the third state-wide investigating grand jury recommended that Thomas Smithers be charged with receiving stolen property, conspiracy, obstruction of justice, intimidation of a witness, removal or falsification of identification numbers, dealing in vehicles with removed or falsified numbers, dealing in titles and plates for stolen vehicles, and false application for certificate of title or registration. Smithers was the owner of a car repair garage.

On January 6, 1986, Smithers and Gregory B. Abeln, Deputy Attorney General for the Commonwealth, entered into a letter *agreement*. The agreement provides that "subject to the following terms and conditions," Smithers would not be considered a "subject to be charged in the pending investigation involving vehicle theft and insurance fraud in the northeastern part of Pennsylvania." Exhibit B to Petition for Post–Conviction Relief, 10/10/96, at 1. The letter also provides that no information given by Smithers to authorities would be used against him. The commitment by the Office of Attorney General was "conditional upon [Smithers's] providing full, complete, and truthful information regarding the above investigation." *Id.* The letter also states that Smithers's cooperation would "consist of being available for interviews by law enforcement officials at reasonable times, being available for grand jury and court appearances, and submitting to polygraph examinations . . ." *Id.* at 2.

The signatory to the letter on behalf of the Commonwealth, Gregory B. Abeln, was the prosecuting attorney at appellant's trial. Not only did Mr. Abeln not reveal the existence of this agreement to appellant, he allowed Mr. Smithers to give false testimony on the stand as to the existence of the agreement. On cross-examination, the following exchange occurred between defense counsel and Mr. Smithers:

Q. Now, some of your records were taken by the State Police, is that correct?

A. That's correct.

Q. What records did they take?

A. They only took the state inspection records.

Q. State inspection records?

A. That's correct.

Q. They didn't get any titles that you had, is that right?

A. No, sir.

Q. Were you subsequently charged with anything by the State Police?

A. No, I was not.

Q. You were not. Are you currently working with them on a deal that you have made with the State Police?

A. No, sir, I am not.

Q. You are not. You have not in any way cooperated with the State Police, is that correct, in exchange for some deal with them?

A. No, sir.

Q. You did not. You are here to testify completely on your own without any direction from the State Police, is that correct?

A. That's correct.

Q. Did you have any vehicle charges against you at any time? Were you tried?

A. No, sir.

Q. You weren't tried?

A. No, sir.

Q. Did you plead to any charges at any time?

A. No, sir.

Notes of Testimony ("N.T."), 5/4/87, at 89–90. Mr. Abeln, who knew that Smithers had been offered freedom from prosecution in exchange for his testimony and knew that Smithers had been recommended for charges by the investigating grand jury, did nothing to correct this testimony.[3]

We evaluate the prosecution's use of false evidence under the following standards:

> The rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, arguably applies in three quite different situations. Each involves the discovery, after trial, of information, which had been known to the prosecution but unknown to the defense.
>
> In the first situation, typified by *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In a series of subsequent cases, [this] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.*

*United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (emphasis added) (footnotes omitted).

In addition, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court addressed a situation identical to the one at issue. The government had failed to reveal to defense counsel that its key witness had been promised that he would not be prosecuted if he testified for the government. The witness was the defendant's co-conspirator and testified that the defendant instigated the crimes at issue, which included forgery of money orders. Further, when cross-examined, the witness denied that he had been promised that he would not be prosecuted if he testified against the defendant.

The *Giglio* Court noted that the presentation by the prosecution of known, false evidence is not compatible with the basic demands of justice and that the same analysis applies when the prosecution allows false testimony to go uncorrected. It held that a new trial is required if the false testimony could in any reasonable likelihood have affected the jury's verdict. In *Giglio*, the Court noted that the government's case rested almost entirely on the witness's testimony and that accordingly, his credibility was an important

---

**3.** The Commonwealth does not contest that the answers to the questions were misleading and false.

issue. In conclusion, the Court held that evidence of an understanding or agreement regarding future prosecution would be relevant to his credibility and the jury should have been informed of it. The Court granted the defendant a new trial.

In addition to *Giglio*, we find guidance in *Commonwealth v. Wallace*, 500 Pa. 270, 455 A.2d 1187 (1983). In *Wallace*, a key witness testified that the defendant confessed to the crime while the witness and the defendant were jailed. That witness also gave false information concerning the pendency of criminal charges against him at the time of trial, the nature of other crimes for which he had been convicted, and his jail status over the years. The testimony was not corrected by the Commonwealth.

The Court in *Wallace*, utilizing the above federal standards, observed that in the situation where the prosecution obtains a conviction through the use of false or perjured testimony, a strict standard of materiality must be applied. Under that criterion, the false testimony is considered material if it could in any reasonable likelihood have affected the verdict. The Court also stated that where a witness's reliability may be determinative of guilt or innocence, failure to correct evidence relating to credibility falls within this rule. Finally, the *Wallace* Court concluded that the state of mind of the prosecutor is not material, but rather, the important issue is whether the accused received a fair trial.

Thus, under the above case law, we must examine the trial evidence and determine whether the false testimony, in any reasonable likelihood, could have affected the jury's verdict. The trial judge in this case, whose reasoning the Commonwealth urges us to adopt, determined that Smithers's testimony was not material under this standard. We are unable to agree with this assessment.

The Commonwealth's first witness, State Police Trooper Alexander Horek, testified as follows. In August 1984, he was assigned with other state troopers to investigate a car theft. On August 28, 1984, he went to appellant's residence and served a search warrant with respect to a 1979 Ford Bronco. The Bronco had a special vehicle identification number ("VIN") plate attached to the inside compartment. A special VIN plate is one obtained through an application when the original VIN plate, required to be visible on all cars, is lost. The Bronco's actual VIN, which was stamped on the engine, was different from the VIN number on the special plate.

Trooper Horek confirmed, using the true VIN, that the Bronco had been stolen from Mr. and Mrs. George Timko on January 7, 1982. The VIN affixed to the special plate belonged to a 1974 Ford Pinto. Charles Davis originally owned the Pinto, and records revealed that Thomas Smithers had the Pinto at his garage, known as the Mount Pocono or Happy Hooker Garage, in Mount Pocono. Trooper Horek took the Bronco to the police barracks in Honesdale. In September 1984, it was burned by an arsonist.

The Trooper confronted appellant with the title history for the Pinto, which indicated that appellant purchased the Pinto from Charles Davis on October 20, 1982. Appellant admitted that his signature was on the reverse side of the title to the Pinto.

The Commonwealth's next witness was Michael Fuller, special agent in the Office of the Attorney General, Bureau of Criminal Investigation and qualified as an expert on vehicle theft investigation and vehicle identification numbers. He participated in the state police's investigation of appellant. Agent Fuller explained that every vehicle has a true VIN which is affixed to a car in more than one location. Each VIN is coded. The VIN will indicate the car's year of manufacture, where it was manufactured, the type of car it is, and also the specific number of that car manufactured in that year in the given location.

The location of the VIN varies according to the vehicle. The VIN is affixed in a public place which is readily viewable and is known as the public VIN. All vehicles must display a public VIN number. In addition, manufacturers place the VIN on various secret locations in the car. The location of the secret VIN is not readily available to the public and is placed by the manufacturer to assist law enforcement agencies in combating car theft.

The secret VIN helps to identify the vehicle in the event that the original, public VIN is removed from the car. Unless there is tampering, the secret VIN and public VIN are the same.

Agent Fuller looked for the VIN on the Bronco seized from appellant. His examination revealed several unusual items. The public VIN plate and a federal safety certification label, which must be on all cars since 1970 under federal regulations, both were missing. A special VIN plate had been attached to the firewall of the Bronco. The VIN number on the special plate indicated that it was a 1974 Ford Pinto rather than a 1979 Bronco. Agent Fuller then checked for the secret VIN, which investigation revealed was assigned to a 1979 Ford Bronco stolen in 1982. Introduced into evidence was appellant's application for a special VIN plate, which was the plate attached to the Bronco.

The Commonwealth's next witness was State Trooper Francis T. Golden. On September 4, 1984, appellant came to the police barracks where the Bronco had been taken. Appellant showed Trooper Golden a receipt which indicated that on May 8, 1990, he purchased a 1979 Bronco from Brian Hawk in exchange for $991 in welding services and $2,000 cash. The receipt is on a billing invoice for the Happy Hooker Garage, which was owned by Thomas Smithers. Approximately three weeks later, on September 25, 1984, when Trooper Golden arrived at work, the Bronco was burnt and smelled strongly of gasoline.[4] Trooper Michael D. Novatnek testified that he found a one-gallon can of fiberglass resin in appellant's basement on October 5, 1984. Two cans of the same resin were taken from the scene of the arson on September 25, 1984. All three cans of resin bore the same lot number. Appellant told Trooper Novatnek that appellant's brother had purchased the resin.

Thomas Smithers testified next. At the time of trial, he was a private investigator and restaurant owner. Formerly, he owned an inspection station called Mount Pocono Garage. Charles Davis brought him a 1974 Pinto which did not pass inspection due to a cracked frame. Mr. Davis told Smithers to dispose of the car and gave Smithers the title. Appellant wanted to purchase the car, and Smithers gave it to him since he had no money invested in it and since he and appellant had been friends for nine years. Smithers stated that appellant already owned a Bronco.

During the following exchange, Smithers further testified that appellant admitted to setting the Bronco on fire:

Q. Did you discuss the fire at the State Police Barracks with the Defendant, Steven Romansky?

A. Yes.

Q. And what did he tell you?

A. That he went up there. He was going to slap them in the face. He was going to blow up the vehicle. He was going to blow up the State Police Barracks. He wasn't done there with them. He knew where they lived, where their families lived. He knew where my family was. He would roll my car over . . .

N.T., 5/4/87, at 74–75. Smithers also indicated that he never called his garage the Happy Hooker Garage but had planned to use that name for a towing business, which never materialized.

Next, the Commonwealth introduced evidence relating to the 1977 GMC truck. Trooper Horek took the witness stand again, testifying as follows. Police examined the inspection records of Tom Smithers's garage, looking for documents relating to a 1978 or 1979 Chevrolet truck. They were checking on this vehicle because records showed that it had a VIN which actually had been assigned to a 1966 Chevrolet truck. Smithers's records indicated that appellant had performed inspections on the 1978–79 truck in 1978 and 1979.

On October 5, 1984, police went to appellant's residence with a search warrant for the 1978–79 Chevrolet truck. Once there, they seized a 1977 GMC truck rather than the

4. The record indicates that appellant was charged separately with the arson of the 1979 Bronco and with attempting to obstruct justice for secreting the 1977 Trans Am, which we discuss later in this adjudication.

1978–79 Chevrolet. They seized the GMC truck because the federal decal sticker was missing and there was an indication that someone had tampered with the VIN number.

Appellant told Trooper Horek that the GMC truck belonged to him and that he had purchased it from his brother. Trooper Fuller, who was assisting Trooper Horek, found the secret VIN, which belonged to a 1977 GMC pick-up truck stolen on April 28, 1981, from Frank Getz and Donald Williams of the Strickland Mountain Inn, Mount Pocono. Trooper Fuller testified that the original public VIN had been removed from the 1977 GMC truck and replaced with a VIN belonging to a 1966 Chevrolet truck. The Commonwealth then introduced documents showing that from 1978 to 1984, appellant was the registered owner of the 1966 Chevrolet truck with the VIN number that was affixed as the public VIN on the 1977 GMC truck.

Trooper Horek then gave testimony relating to the third vehicle. While Trooper Horek was executing the August 28, 1984 search warrant, he observed a 1972 medium blue Pontiac Trans Am. Appellant's wife, Frances, told Trooper Horek that the Trans Am belonged to her. When the officers returned to execute the October 5, 1986 warrant, police asked appellant where the Trans Am was located. Appellant responded that the Trans Am was not at his house, that he and his wife owned the car, and that he had purchased it in 1973 from a car dealership.

David Swiderski, Chief of Police of Mount Pocono, testified next. On September 1, 1984, he received information that a stolen Pontiac was located on Otto Stranak's property in Mount Pocono. When police arrived at Mr. Stranak's property, he gave them permission to search his garage, which contained a Trans Am. Mr. Stranak told police that the car belonged to appellant. Chief Swiderski found indications that the original public VIN number on the car had been replaced, and he seized the car. The public VIN on the vehicle was issued to a 1972 Pontiac owned by Frances, appellant's wife. Chief Swiderski ran a check on the private VIN assigned to the car, and it was assigned to a 1977 Pontiac Trans Am stolen from Albert Pepe of New Jersey while it was parked in Tannersville, Pennsylvania on September 23, 1983.

The car dealership identified by appellant had no record of selling a Trans Am to him or his wife. The Trans Am was taken into police custody on September 1, 1984, and was stolen from them on September 2, 1984. It was recovered, and Chief Swiderski examined it. He stated that the car had been painted black, rather than the powder blue color that it was painted when confiscated from Stranak's property. The black paint did not cover the vehicle completely, and spots of the original powder blue showed through.

Trooper Novatnek testified regarding the circumstances surrounding recovery of the 1977 Trans Am. Approximately one and one-half years after it was reported stolen from police barracks, police received information that the car was located in a garage owned by Mary Yanilevich in Pike County. Ms. Yanilevich gave Trooper Novatnek permission to search the garage and the key to it. Troopers Fuller and Novatnek discovered the car in the garage. Ms. Yanilevich testified that appellant had asked to use the garage to store items and that she had given him a key to it. The garage is located approximately 500 feet from appellant's residence. Ms. Yanilevich stated that she had not placed the Pontiac in her garage.

Officer Novatnek also testified that appellant's wife had a 1972 Pontiac titled and registered in her name. That 1972 Pontiac's VIN is the public VIN which had been applied over the original public VIN on the 1977 Trans Am. The record also establishes that in 1973, both appellant and his wife testified before a state investigating grand jury that they purchased the 1977 Pontiac seized from their property on August 28, 1974.

Appellant presented the following evidence in rebuttal. Joseph Romansky, appellant's brother, testified that he sold a 1966 Chevrolet truck to appellant and that appellant had performed a substantial amount of repair work on the truck, including extensive body work. Thus, this testimony created the inference that appellant included newer truck parts containing the secret VIN from the 1977 GMC truck on the 1966 Chevrolet.

Next, Douglas Kronochan testified that Smithers had called his garage the Happy Hooker Garage for sometime before it was re-named the Mount Pocono garage. He had worked for Smithers, often had trouble receiving pay from Smithers, and Smithers often would not place the name of a mechanic performing a state inspection in his inspection book until Smithers was informed that a state trooper was about to enter the garage. Mr. Kronochan further testified that he saw Smithers place inspection stickers on automobiles without actually inspecting them on numerous occasions and that Smithers had files of titles.

Appellant's other brother, Stanley, testified that he saw appellant purchase a Bronco, not a Pinto, from Smithers.

Otto Stranak testified next. He also said that Smithers sold a Bronco to appellant. Mr. Stranak further stated that Smithers and he both had testified before the investigating grand jury. While they were waiting to testify, Smithers had threatened to "hold a gun" to Stranak's head if Stranak testified against him. N.T., 5/4/87, at 173. Finally, Mr. Stranak stated that Smithers told him that the Pontiac Stranak was keeping in his garage for appellant was stolen.

Appellant testified as follows on his own behalf. He worked as a mechanic for Smithers. Smithers used the different names for his garage so that he could avoid paying income taxes. Appellant purchased the Ford Bronco from Smithers and did not know it was stolen. When appellant purchased the Bronco, Smithers gave him the title to the Pinto, but appellant did not realize that the title was for a Pinto. Appellant applied for a special VIN for the Bronco, using what he did not realized was the Pinto's VIN number from the title. Appellant asked for a special VIN because the Bronco had been damaged before he purchased it and the original VIN was lost.

Appellant further testified that he purchased the Pontiac for his wife from a car dealership and had no reason to know it was stolen. He stated that he did a lot of work on the car, including replacing many parts. He denied seeing the car after police confiscated it in August, 1984, and denied placing it

in Mrs. Yanilevich's garage. Finally, he testified that he purchased the 1966 Chevrolet truck from his brother, who purchased it from Brian Hawks, the owner of Hawk Well Drilling. Appellant performed extensive repair work on that truck, including replacing many parts. He further testified that Smithers kept in his garage many cans of the same type of resin used to start the Bronco on fire.

Finally, appellant indicated that he lent the Trans Am, which had a missing set of keys, to Mr. Stranak. After the Trans Am was stolen, Smithers admitted to appellant that Smithers knew where the Trans Am was located. Appellant denied placing the stolen Trans Am in the garage.

Based on this evidence, appellant was acquitted on the charges relating to the 1977 GMC truck and was acquitted of dealing in titles and plates for the 1977 Pontiac Trans-Am. However, he was convicted of all charges relating to the 1979 Bronco and with receiving stolen property, removal or falsification of identification number, dealing in vehicles with removed or falsified numbers, and conspiracy with respect to the Pontiac Trans Am.

Based on this evidence, we are compelled to conclude that there is a reasonable likelihood that Smithers's false testimony could have affected the verdict in this case as to the convictions for the 1979 Bronco. Smithers and appellant basically accused each other of using the title from the junked Pinto for the stolen 1979 Bronco and of setting the Bronco on fire. Smithers testified that he gave appellant a 1974 Ford Pinto and gave him a title for the same. He also testified that appellant admitted to setting the Bronco on fire after it was confiscated by police, and Smithers accused appellant of threatening Smithers and police.

Appellant counter-accused Smithers of selling appellant a stolen Bronco and of giving him the title to the 1974 Pinto. We have examined the title, which indicates that a Ford was sold to appellant but does not indicate what type of Ford was transferred. Appellant admitted to asking for a special VIN but stated that he did so because the Bronco did not have its public VIN intact when he purchased it from Smithers. Appellant also testified that Smithers used in his

car repair business the same type of resin used to light the Bronco on fire at the police barracks.

Furthermore, Otto Stranak testified that Smithers threatened to kill him if he gave testimony before the investigating grand jury which implicated Smithers in the investigation. One of charges recommended against Smithers by the investigating grand jury was intimidation of a witness. Mr. Stranak and Mr. Kronochon testified that Smithers routinely kept a great many titles around his shop, creating the implication that he saved the titles from junked cars to use for newly-stolen vehicles. Stranak and appellant's brother also testified that Smithers sold appellant the stolen Bronco and not a Pinto.

Thus, Smithers's credibility was a key factor in this case with respect to the charges relating to the 1979 Bronco. Appellant tried to paint him as the guilty party who · also threatened witnesses and burned the car. Smithers leveled the same charges against appellant. The fact that Smithers was recommended to be charged by the investigating grand jury on the Bronco charges and was testifying against appellant in exchange for immunity from prosecution may have affected the jury's verdict as to the 1979 Bronco. Apparently, the jury credited appellant's testimony that he unwittingly used parts containing the VIN from the stolen GMC truck in repairing his 1966 Chevrolet truck. Had the jury known Smithers was indicted for the 1979 Bronco, it also may have acquitted appellant of charges relating to it.

We acknowledge the trial court's position that police testimony and title documents establish that the 1979 Bronco in appellant's possession was stolen and had a public VIN of a 1974 Pinto which was titled in appellant's name. However, appellant specifically testified that he purchased a Bronco from Smithers and that *Smithers* gave him a Pinto title, which appellant did not realize. He also said that he applied for a special VIN for the Bronco not realizing that he was using a Pinto's VIN.

There also was evidence presented by the defense suggesting that Smithers did deal in stolen vehicles. We acknowledge that police testified that appellant told them he purchased the Bronco from Brian Hawks. How-

ever, there were three cars involved in this investigation. Appellant maintained at trial that he purchased the 1977 GMC truck from his brother, who purchased it from Brian Hawks. Thus, police may have been confused about which car appellant was referring to when he showed them the receipt signed by Hawks.

The trial court, in assessing the materiality of Smithers's testimony, examined only the Commonwealth evidence. This examination was too narrow. The Commonwealth's evidence must be viewed in connection with the evidence offered by the defense in deciding the materiality of false testimony.

However, as Smithers's testimony had no relation to the charges for the 1977 Pontiac Trans Am, it was· not material to the jury's verdict on those charges.

Hence, we vacate appellant's convictions for charges stemming from the 1979 Bronco and remand for a new trial as to those charges. Appellant's convictions for charges stemming from the 1977 Pontiac Trans Am shall stand. Jurisdiction relinquished.