J-S79020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                              :        PENNSYLVANIA
                              :
            v.                :
                              :
                              :
                              :
RYAN LEE DUBOISE              :
                              :
          Appellant           :  No. 2190 EDA 2016

Appeal from the Judgment of Sentence June 27, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011415-2014

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:              **FILED FEBRUARY 06, 2018**

Ryan Lee Duboise appeals, *pro se*, from his judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after he was convicted of third-degree murder[1] and possession of an instrument of crime (PIC)[2] in connection with the beating and strangulation death of his former girlfriend.  After careful review, we affirm.

The trial court summarized the facts of the instant case as follows:

> From the time [the victim,] Monet Hall[,] and [Duboise] began dating, until the moment [Duboise] murdered her, the two had a violent and abusive relationship.  In January 2014, Hall and [Duboise] moved into an apartment on Allegheny Avenue in Philadelphia.  Not long after, on February 5, 2014, Hall sought treatment at Mercy Fitzgerald Hospital for rib injuries.  On February 22, 2014, Hall's cousin, Angela Starks, called 911 after

---

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 907(a).

a crying Hall called her and told her that [Duboise] would not stop punching her in the stomach. On March 4, 2014, Hall was treated at Temple University Hospital for a closed head injury, contusions, and a facial laceration, after being hit in the head with a bottle.

On the morning of April 2, 2014, two days before Hall was found dead, Police Officer Christopher Reeder and his partner responded to a 911 call for a person with a weapon on Allegheny Avenue. The police encountered Hall[,] who appeared under the influence[,] and requested transportation to a hospital. She informed police that she had had an altercation with her boyfriend and that her head hurt. That same day, Hall told Temple University Hospital staff that her boyfriend physically assaulted, punched, and kicked her. She was offered social service help but declined.

On the morning of April 4, 2014, after [Duboise] returned to his apartment from spending the night at his best friend Dustin Taylor's house, he called 911 and reported that he had found Hall unresponsive. When medics arrived at or around 7:30 a.m., they found Hall dead, lying naked on a bed. [Duboise] claimed that he did not know what had happened to her. After the medics informed [Duboise] that Hall was dead, [Duboise] swiftly left the apartment. Outside, he encountered Firefighter Captain Crespo. According to the captain, [Duboise] appeared nervous and uncomfortable and refused to give his name or relation to the deceased. [Duboise] then walked to the corner and disappeared.

In the bedroom where Hall was found dead, Officer Guaraldo recovered a broken flat iron inside a wastebasket near the bed. The flat iron was broken into three pieces: a large piece connected to a cord, a paddle-like shaped piece, and a small plastic piece. Both Detective Crone and Officer Guaraldo observed a unique pattern of marks on Hall's buttock and left hip consistent with the flat iron's shape. After noticing injuries around Hall's neck, they also found an audio-visual ("AV") cord on the television stand at the foot of the bed. DNA mixtures found on both the flat iron and the AV cord were consistent with that of Hall and [Duboise].

Dr. Gary Collins, former Deputy Chief Medical Examiner of Philadelphia, testified that Hall had numerous bruis[es], abrasions, and scrapes about her face, forearms, hips, legs, and buttocks. The cause of death was homicidal violence, including blunt impact injuries and strangulation. The victim's bodily injuries were severe enough to cause a large amount of fat emboli

to enter the blood vessels of her lungs, preventing proper oxygenation of her blood, which may have contributed to her death.

After [Duboise] returned to the scene, Captain Crespo pointed him out to police. When questioned by police, [Duboise] said that Hall had died from a drug overdose and that someone had beaten her. The officers decided to bring him to the homicide unit for further questioning. When placing [Duboise] in handcuffs, the officers noticed that his hands were swollen with several marks on his right hand. Officer Van Sciver observed that [Duboise's] hands were so swollen that they were almost double their normal size.

On April 4 and on May 20, 2014, Dustin Taylor gave statements to Philadelphia Police detectives. He told detectives that [Duboise] came to his apartment on the night of April 3, 2014 (the night before Hall was found dead), and that his hands were swollen – his right hand was so puffy, it resembled "genetically modified chickens." Taylor said he joked about [Duboise's] swollen hands, but [Duboise] did not respond, something Taylor found strange.

Taylor also informed detectives that [Duboise] and Hall had domestic problems and that [Duboise] had complained to Taylor several times about Hall stealing drugs (crack and heroin) from him. [Duboise] also told Taylor that he would kick and punch Hall's ankles and legs and verbally abuse her, calling her a bitch, whore, and crack whore. Taylor said that two days before [Duboise] slept at his house, [Duboise] and Hall had a domestic incident after Hall stole $20.00 from [Duboise] and used it to get high.

Recovered video footage from surveillance cameras located diagonally across and down the street from [Duboise] and Hall's apartment showed an individual leaving at or about 8:20 p.m. on April 3, 2014, and returning to the apartment the next morning at or about 7:27 a.m. No one was seen on the video entering or exiting the property after the individual left. When [a] detective brought [Duboise] into the Homicide Unit on April 4, his clothing was consistent with the clothing worn by the individual in the video—a black, white, and grey checkered shirt with a hoodie.

Francis Curry, [Duboise's] cell mate while incarcerated in April or May 2014 at the George W. Hill Correctional Facility in Delaware County, testified that after [Duboise] was arrested for Hall's murder, he told Curry that right before Hall died, he and Hall

argued over a phone call from another male and that Hall had stolen money for pills (Xanax). [Duboise] told Curry that he hit Hall a couple times and gave her more pills. He claimed that after Hall ingested the pills, she made gargling sounds and asked for [Duboise] to call 911, but he refused. [Duboise] claimed that he left Hall in the apartment; when he returned, she was dead.

Trial Court Opinion, 9/8/16, at 2-5 (footnotes and citations to record omitted).

In December 2014, Duboise moved to have his trial attorney removed from the case and sought to proceed *pro* se. On February 12, 2015, the trial court granted Duboise's request to proceed *pro se*.[3] A five-day jury trial was held in the matter in April 2016. On April 12, 2016, Duboise was found guilty of the above-stated offenses. On June 1, 2016, prior to sentencing, Duboise filed a motion for judgment of acquittal[4] challenging the sufficiency and weight of the evidence, as well as alleging prosecutorial misconduct. On June 27, 2016, the court sentenced Duboise to an aggregate term of 22½ to 45 years' imprisonment.[5]

_____

[3] W. Fred Harrison, Jr., Esquire, was appointed as standby counsel for Duboise's trial in April 2015. Prior to that date, Duboise had other standby counsel who was removed at Duboise's request in April 2015.

[4] We note that "[u]nder extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion . . . for a judgment of acquittal[.]" Pa.R.Crim.P. 704(B)(1). The judge shall decide such a motion "before imposing sentence, and shall not delay the sentencing proceeding in order to decide it." *Id.* at 704(B)(2). Duboise orally renewed this motion immediately prior to sentencing, and that the court denied it on the record. *See* N.T. Sentencing, 6/27/16, at 29.

[5] Specifically, the court sentenced Duboise to 20-40 years' imprisonment for murder, and a consecutive sentence of 2½-5 years in prison for PIC.

Duboise filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Duboise presents the following issues for our review:

(1) Was the evidence presented at trial legally sufficient to support the jury's verdict beyond a reasonable doubt that [Duboise] committed [t]hird-degree murder where the evidence presented by the Commonwealth to establish [Duboise's] guilt was at least equally consistent with his innocence?

(2) Was the evidence presented at trial legally sufficient to support the jury's guilty verdict on the charge [of] Possession of an Instrument of Crime?

(3) Was the jury's guilty verdict for the charge of [t]hird-degree murder against the weight of the evidence?[6]

(4) Did the trial court abuse its discretion, in violation of Pennsylvania Rules of Evidence, Rules, 402, 602, 802, by allowing the Commonwealth to admit into evidence Angela Starks' testimony regarding declarations previously made by Ms. Hall over [Duboise's] objection and did not St[ar]ks' testimony constitute inadmissible hearsay?

(5) Did the trial court abuse its discretion, in violation of Pennsylvania Rules of Evidence, Rule 702, by allowing Detective Crone to offer a medical and scientific opinion about the nature and causes of the victim's injuries over [Duboise's] objection and did not [sic] Crone qualify as an expert in forensic pathology?

(6) Did the trial court abuse its discretion, in violation of [Duboise's] state and federal constitutional rights to due process of law, his right to a fair [trial]; his right to a compulsory process in obtaining witnesses in his favor and his right to present a meaningful defense, by refusing to

_____

[6] We note that Duboise has preserved his challenge to the weight of the evidence. *See* Pa.R.Crim.P. 607(A)(2) ("A claim the verdict was against the weight of the evidence shall be raised with the trial judge . . . by written motion at any time before sentencing.").

provide him funds to employ expert witnesses including, a forensic pathologist, expert in blood splattering and a video expert?

(7)   Did the trial court abuse its discretion in violation of [Duboise's] state and federal constitutional rights to due process of law, his right to a fair trial; his right to . . . present a meaningful defense and his right to a compulsory disclosure, by conducting an *ex parte* hearing without him present, sealing police records from the defense and did not the records contain exculpatory value?

(8)   Did the prosecutor withhold exculpatory or impeachment video evidence in violation of [Duboise's] state and federal constitutional rights to due process of law and his right to a fair trial, and did the undisclosed video evidence have a bearing on [Duboise's] guilt or innocence?

(9)   Did the trial court abuse its discretion, in violation of Pennsylvania Rule of Evidence Rule 404(b), by allowing the Commonwealth to admit into evidence the victim's medical records and [were] not the records relevant to the murder of the victim?

(10)  Did the trial court abuse its discretion, when it allowed Officer Reeder to testify at trial and did not the trial court err when it ruled that [Duboise] elicited hearsay testimony from Officer Reeder?

(11)  Did the trial court abuse its discretion, when it ruled that [Duboise] elicited hearsay testimony from Detective Sierra?

(12)  Was Dr. Collins' testimony at trial contradictory and beyond the scope of his opinion in his pre-trial report (Hall's post-mortem exam) with respect to the date and time the victim sustained her fatal injuries?

(13)  Whether the method of prosecution used by the Commonwealth against [Duboise] was malicious and in bad faith, when the prosecutor elicited misleading testimony from Dr. Collins about the time when the victim's murder occurred to mislead the jury?

In his first three issues on appeal, Duboise challenges the sufficiency and weight of the evidence. After reviewing the parties' briefs, relevant case law and certified record, we affirm those three issues based upon the trial court opinion authored by the Honorable Barbara A. McDermott.[7]   *See* Pa.R.A.P. 1925(a) Opinion, 9/8/15, at 13-18.

In his fourth issue on appeal, Duboise contends that the trial court erroneously admitted Angela Starks' testimony regarding statements the victim made about him punching her in the stomach. Duboise argues this was inadmissible hearsay testimony that is not subject to a hearsay exception. We disagree.

Hearsay testimony is a statement, other than one made by the declarant, offered in evidence to prove the truth of the matter asserted, and is generally inadmissible at trial. *See* Pa.R.E. 801(c), 802. However, excited utterances and statements relating to the declarant's existing state of mind are admissible exceptions to the hearsay rule. *See* Pa.R.E. 803(2), (3). Pennsylvania Rule of Evidence 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The Pennsylvania Supreme Court has explained that "it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and,

---

[7] We instruct the parties to attach a copy of the trial court's decision in the event of further proceedings in the matter.

second, that her declarations were a spontaneous reaction to that startling event." ***Commonwealth v. Sherwood***, 982 A.2d 483, 496 (Pa. 2009).

Instantly, the trial court admitted Starks' testimony, finding that:

Starks' testimony was not offered for the truth of the matter. Starks' testimony about Hall informing her that [Duboise] punched her in the stomach was offered to show the reason why Starks dialed 911. Moreover, the court properly precluded any conversation between Starks and Hall that took place after Starks called 911. N.T. 4/5/[]16[,] at 46-55.

Trial Court Opinion, 9/8/15, at 6.

Here, Starks testified that she received a phone call from Hall in the afternoon on February 22, 2014. When she answered the phone, Hall was "crying [and s]he sounded frightened, desperate. Just really it was a fear response, scared, like she needed help." N.T. Trial, 4/5/16, at 52-53. She testified that Hall's tone was like she was "hurt, [a] scared kind of thing," ***id.*** at 53, and that she told Starks that her boyfriend "wouldn't stop punching [her] in the stomach." ***Id.*** at 53-54. We find that Hall's statement to Starks was made at a time when she believed that Duboise was trying to seriously hurt her and, thus, that it qualifies as an "excited utterance" hearsay exception under Rule 803(2). ***Sherwood***, ***supra***. ***See also Commonwealth v. Luster***, 71 A.3d 1029 (Pa. Super. 2013) (where witness testified that victim called him on cell phone while riding in car with defendant and that victim was crying, said she was scared, and that defendant was trying to kill her, statement properly admitted as excited utterance under Rule 803(2)).

Accordingly, we conclude that the trial court did not err in admitting the statement.[8]

Duboise next contends that the trial court improperly allowed a non-expert, Detective James Crone of the Philadelphia Police Department, to testify about medical and scientific matters relating to the nature and cause of Hall's injuries. Specifically, Duboise argues that Officer Crone's testimony regarding ligature marks and burn marks on Hall's body should have been excluded.

Instantly, Officer Crone was the first police officer to arrive at the victim's apartment after it was determined to be a crime scene. During direct examination the following exchange took place:

> **Officer Crone**: A physical examination of the decedent revealed that she had bruising on her entire body covering her face, neck, arms, shoulders, chest, back, buttocks, stomach and legs. She also had what I believed to be ligature marks.

---

[8] To the extent that the trial court admitted Starks' testimony as relevant to show motive, malice intent and ill-will towards the victim under Pa.R.E. 404(b)(2), we note that the testimony was plainly relevant to Duboise's motive only to the degree that the hearsay statements were true. **See Commonwealth v. Moore**, 937 A.2d 1062 (Pa. 2007). Moreover to the extent that the testimony was admitted as state of mind evidence under Rule 803(3), we note that this exception relates to the state of mind of the declarant, not the defendant. **See** Pa.R.Crim.P. 803(3) (exception to hearsay rule for a "statement of the *declarant's* then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health.") (emphasis added). Because Duboise's defense strategy was to establish reasonable doubt with regard to the person who inflicted the fatal wounds to Hall, there was no issue concerning the victim's state of mind. **Moore**, **supra**.

**Duboise**: Objection to the ligature marks.

**Court**: Members of the jury, he is testifying to what he saw. He can give what [he saw] based upon his experience, but, again, he's not an expert, so you have to make a factual determination based on other evidence whether that's what it is.

So it's partially sustained, the objection.

**District Attorney**: So you described these as ligature marks. Without using what I guess would be medical terms, what did you see around the neck that led you to think that's what they were?

**Officer Crone**: The victim on both her right and left side of the neck had horizontal marks which would have been consistent with having some type of object wrapped around her neck consistent with strangulation. One of the things that we had looked for inside of that particular bedroom was any object that was nearby that may have been used to strangle the victim.

N.T. Trial, 4/6/16, at 100-101. Counsel then showed the jury a photograph, admitted as Exhibit 28, showing horizontal marks on the right side of Hall's neck which Officer Crone confirmed were the "ligature marks" he referred to in his testimony. *Id.* at 101-102. The district attorney then stated that Crone was not an expert with regard to what might have caused those marks on the victim. *Id.* 102. Finally, Officer Crone testified that, because of the marks on Hall's neck, as a detective he searched the bedroom for anything that might have been wrapped around the victim's neck to cause those injuries. *Id.* at 103.[9]

Instantly, Officer Crone's testimony regarding marks on the victim's neck was nothing more than observations made by a homicide detective in

---

[9] The medical expert's report noted that there were "band-like abrasions" on Hall's neck and that the cause of death, in part, was due to strangulation.

the course of his business. As the trial court notes in its Rule 1925(a) opinion, "a homicide detective's primary purpose, along with the Crime Scene Unit, 'is to process the scene, to make all relevant observations about what is there and what might have occurred, [and to] photograph, document[,] and recover evidence." Trial Court Opinion, at 9/8/15, at 17, *citing* N.T. Trial, 4/6/16, at 96. Moreover, the court clearly instructed the jury that Officer Crone is not an expert in forensic pathology and that his testimony was offered solely to explain what he observed at the crime scene and to explain his method of investigation at a crime scene. We find no error in the admission of his testimony.

Duboise next argues that the trial court violated his state and federal constitutional rights to due process and equal protection, right to a fair trial, and compulsory process when it denied him funds to employ expert witnesses, including a forensic pathologist, an expert in blood splattering, and a forensic video analyst.[10]

_____

[10] To support this claim, Duboise relies, in large part, on ***Ake v. Oklahoma***, 470 U.S. 68 (1985), which held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a

On April 28, 2015, the trial court granted Duboise's request to retain experts. As of May 14, 2015, Duboise had not yet retained an expert or an investigator. On July 20, 2015, the court entered an order permitting Duboise to retain, at the cost of up to $4,000 each, a forensic pathologist and crime lab. Order, 7/20/15. On August 18, 2015, the court entered another order granting Duboise approval to hire a defense investigation service at the cost of up to $3,000; the order specified that the court would not pay for the service until Duboise "present[ed] proof of an invoice for said services and [until the invoice was] approv[ed] by a judge of the Court." Order, 8/18/15. Both the July and August 2015 orders were entered without prejudice to stand-by counsel's right to apply to the court for additional funds in the future upon a showing of need.

On September 29, 2015, Duboise filed a *pro se* continuance motion seeking 60 days to secure a new pathologist, as the pathologist he had retained had become unavailable. On November 2, 2015, the court granted Duboise's motion for extra time to secure a pathologist, giving him until December 15, 2015, to submit his expert reports. On December 7, 2015, Duboise filed another *pro se* continuance motion seeking until January 15,

---

psychiatrist of his personal liking or to receive funds to hire his own.

**Id.** at 83. **Ake**, however, limits its holding to indigent defendants being entitled to funding for psychiatric experts in the limited circumstances where the defendant's sanity at the time of the offense is a significant issue at trial. Here, Duboise's sanity was never an issue at the time of the offense or at trial.

2016, to permit his new pathologist additional time to conduct a full examination of defense reports, alleging that the court-appointed investigator had misled him to believe that a new pathologist had been retained.

Appointment of expert witnesses and the provision of public funds to hire them to assist in the defense against criminal charges are decisions within the trial court's sound discretion and will not be reversed absent an abuse thereof. *Commonwealth v. Wholaver*, 989 A.2d 883, 894 (Pa. 2010). Indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. *Commonwealth v. Konias*, 136 A.3d 1014 (Pa. Super. 2016). "The State has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense." *Id.* at 1019. In *Commonwealth v. Carnutte*, 871 A.2d 839, 842 (Pa. Super. 2005), our Court noted that "[t]here must be some showing as to the content and relevancy of the proposed expert testimony before such a request will be granted."

Here, Duboise acknowledges that the trial judge granted his motion to hire expert witnesses, with monetary limits for the cost of each expert. Duboise also acknowledges that the court granted him a one-month continuance to secure those experts. Duboise argues that that trial court deprived him of his right to a fair trial when it did not pay for a pathologist.

While the court may not have ultimately paid for a pathologist for Duboise's defense, the court permitted him to secure one and offered to pay up to $4,000 for him to retain one. The court, however, set a deadline by which the Duboise had to submit proof of the expert's services (an invoice) to be approved by a trial judge before he would be given the funds.

We find no abuse of the trial court's discretion where it specifically ordered that Duboise be provided funds to hire several experts at the expense of the state, with the condition that he submit invoices before he receives the money. Duboise had the fair opportunity to hire those experts and, had he abided by the reasonable conditions set by the court, he would have had them at his disposal during trial. Moreover, we are not convinced that Duboise demonstrated the need for a pathologist or forensic video analyst.

Here, Duboise claims that a pathologist was needed for his defense because "the Commonwealth . . . presented insufficient and incompetent testimony from its pathologist that testified that he ultimately 'didn't [k]now' when Ms. Hall sustained her fatal injuries." Appellant's Brief, at 42. He is mistaken. Doctor Gary Collins, former Deputy Chief Medical Examiner of Philadelphia, testified for the Commonwealth that Hall could have been fatally injured as early as 5:00 p.m. on the evening of April 3 or as late as the early morning hours of April 4th. Although Collins listed Hall's time of death on the death certificate as 7:30 a.m. on the morning of April 4, he did so because the time of death is when the deceased is *pronounced* dead, such as at the scene of the crime when the paramedics found Hall's lifeless body. Doctor

Collins, however, distinguished this time from the actual time that Hall died, which is determined after a post-mortem exam. Thus, Duboise did not demonstrate that he needed a forensic pathologist where there was no substantial question over the time when Hall sustained her fatal injuries.

Duboise also contends that he needed a forensic video analyst because there was a "substantial question about whether or not video footage showing the front door of Hall's apartment displayed an intruder enter into Hall's apartment after 8:20 p[.]m[.], on April 3, 2014." Appellant's Brief, at 44. Specifically, Duboise is referring to video footage introduced by the Commonwealth showing the front door area and surrounding street area of Hall's apartment building on the evening of April 3 and the morning of April 4.

At trial, Detective Thornsten Lucke testified that the video footage outside Hall's apartment building taken during the evening hours presented a blurrier image than the footage taken during the day. N.T. Jury trial, 4/5/16, at 100-101. Despite this fact, the expert testified that he did not see anyone leave or enter Hall's apartment after 8:20 p.m. on April 3 or before 7:00 a.m. on April 4. Here, Duboise had the burden to show that such an expert was necessary for him to present an adequate defense, the cost of retaining such an expert, and that he was unable to pay for that necessary expert. *Konias*, 136 A.3d at 1019; *Commonwealth v. Cannon*, 954 A.2d 1222, 1227 (Pa. Super. 2008) ("Cannon failed to introduce any evidence as to the cost of retaining an expert to conduct an evaluation and to testify on his behalf. This is a critical element of proof in a claim of indigency."). The fact that Detective

Lucke could not be 100 percent sure that nobody entered or left Hall's apartment during the relevant time period does not mean that there was a "substantial question" about whether an intruder came in or left during that time. In fact, Detective Lucke testified he "made 100 percent effort to view it over and over and over and over again to see somebody come or go, but [he] didn't [see anybody]." N.T. Jury Trial, 4/5/16, at 131. Under such circumstances we could alternatively find that Duboise did not show the required necessity for the requested experts. **Carnutte**, **supra**.

In his next several issues on appeal, Duboise contends that the trial court improperly withheld exculpatory evidence, including raw video footage of the front door of the victim's apartment and police reports of the victim's criminal history and prior domestic abuse incidents with other men. After reviewing the parties' briefs, the relevant law, and the certified record on appeal, we conclude that Judge McDermott's opinion adequately disposes of these issues on appeal. **See** Pa.R.A.P. 1925(a) Opinion, 9/8/15, at 9-11.

Duboise also argues that the trial court improperly admitted Hall's medical records and Officer Reeder's testimony as impermissible evidence of prior bad acts under Pa.R.E. 404(b).

Pursuant to Rule 404:

(b) Crimes, Wrongs or Other Acts.

> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2) Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

**(3) Notice in a Criminal Case.** In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b). "In order for other crimes evidence to be admissible, its probative value must outweigh its potential for unfair prejudice against the defendant, Pa.R.E. 404(b)(2), and a comparison of the crimes proffered must show a logical connection between them and the crime currently charged." *Commonwealth v. Hicks*, 156 A.3d 1114, 1125 (Pa. 2017) (plurality).

Instantly, Hall's medical records and Officer Reeder's testimony showing that Hall had been physically assaulted by Duboise on numerous prior occasions were properly admitted under Rule 404(b). There was a clear logical connection between the proffered bad acts and the underlying charges, where there were substantial similarities in the types of injuries Hall suffered, the way in which she was beaten, and the areas of her body that sustained the fatal injuries. The logical connection between the evidence and the current crimes also strengthened the case that Duboise was the perpetrator. Moreover, the probative value of the evidence clearly outweighed its potential for unfair prejudice where the Commonwealth's case was otherwise based largely on circumstantial evidence. Pa.R.E. 404(b)(2); *Hicks*, *supra*. Thus, we find that the court did not err in admitting the evidence.

Duboise contends that the court violated his right to a fair trial when it allowed hearsay testimony from Detective Sierra by permitting him to read statements that Hall had made to hospital staff that she had been physically assaulted by her boyfriend. He contends that Detective Sierra's testimony did not constitute fair response to his cross-examination of the detective.

On redirect examination, the assistant district attorney asked Detective Sierra if he had had "a chance to look at the language that [the victim] used in all of her own medical records to suggest . . . there was a domestic problem between her and the defendant?" ***Id.*** at 66. Duboise objected to the question; the court overruled the objection, noting "[y]ou[, Duboise] opened the door. You asked about what was said in the medical records. Up until that point, the [c]ourt ruled it was not to come in." ***Id.*** Detective Sierra replied, "[t]here was information when [s]he went to the hospital that her boyfriend had beat on her." ***Id.*** at 66-67.

It is well established that if a defendant delves into what would be objectionable testimony on the part of the Commonwealth, then the Commonwealth can probe further into the objectionable area. ***Commonwealth v. Harris***, 884 A.2d 920, 928 (Pa. Super. 2005). ***See also Commonwealth v. Bey***, 439 A.2d 1175, 1178 (Pa. Super. 1982) (holding where defendant opens door to what otherwise might be objectionable testimony, Commonwealth may probe further to determine veracity of statement).

We agree with the trial court that the assistant district attorney's question on redirect was a fair response to the following questioning of Detective Sierra by Duboise on cross-examination:

> **Duboise:** Now, April 2, where the decedent was transported to Temple Hospital, you read through a record, correct?
>
> \* \* \*
>
> **Det. Sierra:** I didn't look at them now.
>
> \* \* \*
>
> **Duboise:** So you wouldn't know that the records reflect that the decedent was treated negative for head injuries or any face injuries, correct?
>
> **Det. Sierra:** I would have to look at the actual document.
>
> **Duboise:** The actual diagnosis that day, Detective[,] was alleged assault, alcohol and drug abuse and his recommendation was an outpatient treatment for the decedent. She was very uncooperative and was lethargic, slurring her words. . . .
>
> \* \* \*
>
> **Duboise:** You recollect the record says alleged assault?
>
> **Det. Sierra:** Without looking at the actual document, I know that some alleged drug abuse was mentioned in the medical records.

N.T. Trial, 4/8/16, at 36-37.

The Commonwealth's line of questioning regarding the abusive relationship between Hall and Duboise, as well as the injuries she sustained by her boyfriend, as documented in Hall's hospital records, were made in fair response to Duboise's questioning on cross-examination. We find no abuse of discretion. *Harris*, *supra*; *Bey*, *supra*.

- 19 -

In his final two issues on appeal, Duboise argues that Dr. Collins' trial testimony violated Pa.R.C.P. 4003.5, where it was not only contradictory, but also beyond the scope of his opinion in the victim's autopsy report with respect to the time she sustained her fatal injuries. Duboise also claims that the Commonwealth committed prosecutorial misconduct when the district attorney intentionally elicited misleading testimony from Dr. Collins about the date and time that Hall sustained her fatal injuries. After reviewing the parties' briefs, relevant case law and the certified record, we find that the trial court's opinion properly disposes of this issue on appeal. *See* Pa.R.A.P. 1925(a) Opinion, 9/8/15, at 12-13,

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/18

- 20 -

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA  : CP-51-CR-0011415-2014

**FILED** Received Accepted For Review Only

v.                                                     : SEP 0 8 2016          SEP 0 8 2015

Criminal Appeals Unit Criminal Appeals Unit
First Judicial District of PA Judicial District of PA

RYAN DUBOISE

**OPINION**

McDermott, J.                                                           September 8, 2016

## Procedural History

On August 5, 2014, the Defendant, Ryan Duboise, was arrested and charged with Murder and Possession of an Instrument of Crime ("PIC"). On February 2, 2015, the Honorable Benjamin Lerner granted the Defendant's request to proceed *pro se*.[1] On April 4, 2016, the Defendant appeared before this Court and elected to be tried by a jury. On April 12, 2016, the jury returned guilty verdicts to Third-Degree Murder and PIC.

Sentencing was deferred for the completion and review of pre-sentence and mental health reports. On June 27, 2016, this Court sentenced the Defendant to twenty to forty years imprisonment for Third-Degree Murder and a consecutive sentence of two-and-a-half to five years for PIC, for a total sentence of twenty-two-and-a-half to forty-five years imprisonment. On July 5, 2016, the Defendant filed a timely notice of appeal and on July 26, 2016, filed a Rule 1925(b) statement.

CP-51-CR-0011415-2014 Comm. v. Deboise, Ryan L.
Opinion



7496532711

---

[1] On April 28, 2015, Judge Lerner appointed W. Fred Harrison Jr., Esq. as standby counsel.

## Facts

From the time Monet Hall and the Defendant began dating, until the moment the Defendant murdered her, the two had a violent and abusive relationship.[2] In January 2014, Hall and the Defendant moved into an apartment on Allegheny Avenue in Philadelphia. Not long after, on February 5, 2014, Hall sought treatment at Mercy Fitzgerald Hospital for rib injuries. On February 22, 2014, Hall's cousin, Angela Starks, called 911 after a crying Hall called her and told her that the Defendant would not stop punching her in the stomach.[3] On March 4, 2014, Hall was treated at Temple University Hospital for a closed head injury, contusions, and a facial laceration, after being hit in the head with a bottle. N.T. 4/05/2016 at 48–50, 54; N.T. 4/08/2016 at 17–20, 69.

On the morning of April 2, 2014, two days before Hall was found dead, Police Officer Christopher Reeder and his partner responded to a 911 call for a person with a weapon on Allegheny Avenue. The police encountered Hall who appeared under the influence and requested transportation to a hospital. She informed police that she had had an altercation with her boyfriend and that her head hurt. That same day, Hall told Temple University Hospital staff that her boyfriend physically assaulted, punched, and kicked her. She was offered social service help but declined. N.T. 4/06/2016 at 73–76, 90; N.T. 4/08/2016 at 67–68.

On the morning of April 4, 2014, after the Defendant returned to his apartment from spending the night at his best friend Dustin Taylor's house, he called 911 and reported that he had found Hall unresponsive. When medics arrived at or around 7:30 a.m., they found Hall dead, lying naked on a bed. The Defendant claimed that he did not know what had had happened

---

[2] The two met while incarcerated in Delaware County prison in April 2012 and began dating in November 2012. N.T. 4/05/2016 at 48; N.T. 4/08/2016 at 56.

[3] Hall later told Starks that the police never came into the apartment. N.T. 4/05/2016 at 82.

2

to her. After the medics informed the Defendant that Hall was dead, the Defendant swiftly left the apartment. Outside, he encountered Firefighter Captain Crespo. According to the captain, the Defendant appeared nervous and uncomfortable and refused to give his name or his relation to the deceased. The Defendant then walked to the corner and disappeared. N.T. 4/05/2016 at 176–77, 201, 212; N.T. 4/06/2016 at 7–11, 222.

In the bedroom where Hall was found dead, Officer Guaraldo recovered a broken flat iron inside a wastebasket near the bed. The flat iron was broken into three pieces: a large piece connected to a cord, a paddle-like shaped piece, and a small plastic piece. Both Detective Crone and Officer Guaraldo observed a unique pattern of marks on Hall's buttock and left hip consistent with the flat iron's shape. After noticing injuries around Hall's neck, they also found an audio-visual ("AV") cord on the television stand at the foot of the bed. DNA mixtures found on both the flat iron and on the AV cord were consistent with that of Hall and the Defendant.[4] N.T. 4/05/2016 at 151, 153; N.T. 4/06/2016 at 104–06; N.T. 4/08/2016 at 100–27.

Dr. Gary Collins, former Deputy Chief Medical Examiner of Philadelphia,[5] testified that Hall had numerous bruising, abrasions, and scrapes about her face, neck, back, torso, chest, abdomen, shoulders, arms, forearms, hips, legs, and buttock. The cause of death was homicidal violence, including blunt impact injuries and strangulation. The victim's bodily injuries were severe enough to cause a large amount of fat emboli to enter the blood vessels of her lungs,

---

[4] A DNA mixture found on the flat iron was almost two million times more likely to occur from the Defendant and Monet than two unrelated individuals, and 45.98 trillion times more likely to occur than if it had originated from two random unrelated individuals in the African-American population. A second DNA mixture from the flat iron was 10.21 thousand times more likely to come from the Defendant and Hall than random unrelated African-American individuals. A DNA mixture on the cord of the flat iron was almost 46 trillion times more likely to come from the Defendant and Hall than two random unrelated African-American individuals. And a DNA mixture recovered from the AV cord was 14.42 quadrillion times more likely to come from the Defendant and Hall than two random unrelated individuals from the African-American population. N.T. 4/08/2016 at 100–27.

[5] Dr. Collins is presently the Chief Medical Examiner for the State of Delaware, Division of Forensic Science.

3

preventing proper oxygenation of her blood, which may have contributed to her death. N.T. 4/07/2016 at 160–65.

After the Defendant returned to the scene, Captain Crespo pointed him out to police. When questioned by police, the Defendant said that Hall had died from a drug overdose and that someone had beaten her. The officers decided to bring him to the homicide unit for further questioning. When placing the Defendant in handcuffs, the officers noticed his hands were swollen with several marks on his right hand. Officer Van Sciver observed that the Defendant's hands were so swollen that they were almost double their normal size. N.T. 4/05/2016 at 210–14.

On April 4 and on May 20, 2014, Dustin Taylor gave statements to Philadelphia Police detectives. He told detectives that the Defendant came to his apartment on the night of April 3, 2014 (the night before Hall was found dead), and that his hands were swollen—his right hand was so puffy, it resembled "genetically modified chickens." Taylor said he joked about the Defendant's swollen hands, but the Defendant did not respond, something Taylor found strange. N.T. 4/06/2016 at 158, 190–192.

Taylor also informed detectives that the Defendant and Hall had domestic problems and that the Defendant had complained to Taylor several times about Hall stealing drugs (crack and heroin) from him. The Defendant also told Taylor that he would kick and punch Hall's ankles and legs and verbally abuse her, calling her a bitch, whore, and crack whore. Taylor said that two days before the Defendant slept at his house, the Defendant and Hall had a domestic incident after Hall stole $20.00 from the Defendant and used it to get high. N.T. 4/06/2016 at 194–98; N.T. 4/07/2016 at 50.

Recovered video footage from surveillance cameras located diagonally across and down the street from the Defendant and Hall's apartment showed an individual leaving at or about 8:20

4

p.m. on April 3, 2014, and returning to the apartment the next morning at or about 7:27 a.m. No one was seen on the video entering or exiting the property after the individual left. When detectives brought the Defendant into the Homicide Unit on April 4, his clothing was consistent with the clothing worn by the individual in the video—a black, white, and grey checkered shirt with a hoodie. N.T. 4/05/2016 at 97–112, 217, 224, 228; N.T. 4/08/2016 at 60, 64.

Francis Curry, the Defendant's cell mate while incarcerated in April or May 2014 at the George W. Hill Correctional Facility in Delaware County, testified that after the Defendant was arrested for Hall's murder, he told Curry that right before Hall died, he and Hall argued over a phone call from another male and that Hall had stolen money for pills (Xanax). The Defendant told Curry that he hit Hall a couple of times and gave her more pills. He claimed that after Hall ingested the pills, she made gargling sounds and asked for the Defendant to call 911, but he refused. The Defendant claimed that he left Hall in the apartment; when he returned, she was dead. N.T. 4/08/2016 at 158–181.

## Discussion

In his first issue, the Defendant claims that this Court erred in denying the Defendant's motion *in limine* to exclude the testimony of Angela Starks. He argued before trial that Starks' statement to detectives contained inadmissible hearsay. This motion was properly denied as Starks was to testify at trial.

In his 1925(b) statement, the Defendant also claims that Starks' trial testimony, that Hall called her on the phone and said the Defendant would not stop punching her in the stomach, contained hearsay, lacked relevance and personal knowledge, and was highly prejudicial. This claim is meritless as hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *Commonwealth v. Laich*, 777 A.2d 1057, 1060 (Pa. 2001); *see also* Pa.R.E. 801.

5

Starks' testimony was not offered for the truth of the matter. Starks' testimony about Hall informing her that the Defendant punched her in the stomach was offered to show the reason why Starks dialed 911. Moreover, this Court properly precluded any conversation between Starks and Hall that took place after Starks called 911. N.T. 4/05/2016 at 46–55.

The Defendant claims that this Court erred in denying the Defendant's motion *in limine* to exclude Officer Reeder's testimony. The Defendant claims that the officer's testimony contained inadmissible hearsay, lacked relevance and personal knowledge, and was highly prejudicial. On April 2, 2014, Officer Reeder responded to a 911 call at the Defendant's residence. There, he met Monet Hall, who requested to go to the hospital because her head hurt. N.T. 4/08/2016 at 72–90. This Court made a pre-trial ruling that evidence of her injuries from April 2 was permissible because of the closeness in time to her actual death; but statements by Hall to police on April 2 that she had an altercation with her boyfriend were inadmissible.

On cross-examination, the Defendant suggested to Officer Reeder that drugs or alcohol might have been why Hall complained on April 2 about her head. This "opened the door" for the Commonwealth to ask Officer Reeder on re-direct what else might have caused her head to hurt, which could have included an altercation with her boyfriend. *See Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992) (finding a conversation between a detective and a witness admissible when in response to defense counsel's questioning about other possible suspects that may have been overlooked by the police); *see also Commonwealth v. Trivigno*, 750 A.2d 243, 249 (Pa. 2000) (A "remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel."). Because the Defendant "opened the door," the officer's testimony was admissible. Accordingly, this claim is without merit.

6

The Defendant further challenges admission of medical records from Temple University Hospital emergency department from April 2, 2014. This Court ruled pre-trial that any mention of abuse in the records was inadmissible. The Defendant, however, specifically asked Detective Sierra on cross-examination about notes in the medical records, suggesting that the reason Hall was at the hospital on this date was for drug use, and nothing more. N.T. 4/08/2016 at 36–37. On re-direct, this Court permitted the Commonwealth—again, as a fair response—to clarify that the medical records also indicated that Hall went to the hospital on this date not only for drug use, but because she was "physically assaulted by her boyfriend. Punched and kicked." N.T. 4/08/2016 at 67. Because the Defendant, again, "opened the door," this testimony was permissible.

For his next issue, the Defendant claims that this Court erred in denying the Defendant's motion *in limine* to exclude Dustin Taylor's testimony from trial. He argues that Taylor testified to the Defendant's prior bad acts. At trial, Taylor testified to instances of domestic and verbal abuse by the Defendant directed at Hall. The Defendant claims that these instances were inadmissible because he was neither arrested nor charged. He maintains that the testimony was solely used to taint his character.

The Defendant's out-of-court statements to Taylor regarding prior domestic incidents with Hall were admissible by the statements against interest and the party-opponent exceptions to the hearsay rule. *Commonwealth v. Brown*, 52 A.3d 1139 (Pa. 2012); *Commonwealth v. Edwards*, 903 A.2d 1139, 1157–58 (Pa. 2006); *see also* Pa.R.E. 804(b)(3) and Pa.R.E. 803(25). The Defendant also fails to demonstrate how the alleged unfair prejudice outweighed the probative value of Taylor's testimony. Courts have consistently held that "[e]vidence of prior abuse between a defendant and a homicide victim tending to establish motive, intent,

7

malice, or ill will is generally admissible." *Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. Super. 2004) (citation omitted). Evidence of prior abuse may show the chain or sequence of events that formed the history and natural development of the case. *Commonwealth v. Drumheller*, 808 A.2d 893 (Pa. 2002). Moreover, there is no set time limitation on when evidence of prior abuse becomes inadmissible. *See, e.g., Commonwealth v. Ulatoski*, 371 A.2d 186 (Pa. 1977) (finding evidence of bruising on the defendant's wife admissible even though it occurred seventeen months before her death). Lastly, there is no requirement that a defendant be arrested or charged with domestic abuse before said evidence is admissible in a homicide trial. *See, e.g., Commonwealth v. Chandler*, 721 A.2d 1040 (Pa. Super. 1998).[6] For these reasons, the Defendant is not entitled to relief.

The Defendant argues that this Court deprived him a fair trial when it denied him funds to employ expert witnesses, including a pathologist, an expert in blood splattering, a video specialist, and an IT expert. These issues are unsupported. "Appointment of expert witnesses and the provision of public funds to hire them to assist in the defense against criminal charges are decisions within the trial court's sound discretion and will not be reversed absent an abuse thereof." *Commonwealth v. Wholaver*, 989 A.2d 883, 894 (Pa. 2010) (*citing Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998)). This Court informed the Defendant that any pathologist he secured must work within the monetary limits of this Court. After the Defendant could not secure a pathologist, this Court granted the Defendant a one-month continuance to locate one. The Defendant failed to locate one within the additional time.

---

[6] In *Commonwealth v. Chandler*, where the victim's relatives testified to numerous instances where the victim appeared with black eyes, swollen lips, bite marks, and bruises after arguing with appellant, the court offered no analysis on whether the appellant was arrested or charged for these instances. Instead, the court held that "[e]vidence of Appellant's repeated abuse of [the victim] was properly admitted not only to establish motive and malice, but also to show the development of the case and the history of events leading up to the murder." 721 A.2d 1040 (Pa. Super. 1998).

8

For the reimaging expert witnesses, the Defendant offered no offer of proof or a factual basis for experts in blood splattering, video, or IT; nor did he demonstrate that any evidence or information obtained from these witnesses was necessary for the preparation of his defense.

The Defendant claims that this Court erred in denying the Defendant's pre-trial request to exhume Hall's body, depriving him of a full and fair opportunity to challenge the Commonwealth's theory on her death. The Defendant argues that Hall's death was a suicide or an accidental drug overdose. An exhumation of a body is permitted only under extraordinary circumstances. *Commonwealth v. Kivlin*, 406 A.2d 799 (Pa. Super. 1979). Here, the Defendant's request to exhume Hall's body was groundless and absurd. There was no factual basis that in any way suggested that Hall died from suicide or an accidental drug overdose. Although Hall had alprazolam, benzolycgonine (the metabolite of cocaine) in the blood and urine, and very low levels of cocaine in her vitreous (fluid from the eyes), none of these substances were of levels that would cause Hall's death. Dr. Collins' autopsy report conclusively found that Hall died from homicidal violence, not a drug overdose. For these reasons, the claim is devoid of merit.

The Defendant asserts that the Commonwealth knowingly, deliberately, and intentionally withheld exculpatory evidence, including: (1) video footage of unidentified males entering the Defendant's apartment when the Defendant was not present; (2) a death certificate of the victim's post-mortem exam; (3) CAD reports[7] and police incident reports from Clifton Heights, Delaware County; and (4) photographs of the crime scene, which contained images of Hall's nude body.

All four of these issues are unfounded. The Commonwealth passed a flash drive during discovery—provided to the Defendant in prison—which contained all of the raw footage taken

---

[7] A CAD report is a listing of all calls that police respond to at a particular address. N.T. 4/08/2016 at 7.

9

from the video cameras in an around the date of the crime. N.T. 4/05/2016 at 127–134. The Defendant acknowledged to this Court that he had the flash drive and standby counsel confirmed that he (standby counsel) observed its footage prior to trial. *Id.* No one was seen on the video entering or exiting the property after the Defendant left. N.T. 4/08/2016 at 60, 64.

The Commonwealth passed the death certificate to the Defendant during discovery. Even if the Commonwealth had not passed it in discovery, the Defendant fails—as is his burden—to show its exculpatory value. *See Commonwealth v. Koehler*, 36 A.3d 121 (Pa. 2012). The death certificate listed only general information related to Hall's death, all of which was included in Dr. Collins' examination report, which was provided to the Defendant.

The Commonwealth also passed the Philadelphia CAD reports to the Defendant during discovery. Again, even if they had not been passed, the Defendant fails to show their exculpatory value—the CAD reports documented police calls to the Defendant's address and reported inculpatory domestic incidents.

On July 1, 2015, the Honorable Benjamin Lerner denied the Defendant's request for Discovery of the Clifton Height reports after concluding that the reports were not discoverable. Judge Lerner ordered the reports to be sealed. N.T. 7/01/15 at 1–12. These incident reports included accounts of Hall's involvement in a robbery, a theft, drug possession, and a miscellaneous report involving a lost child, who Hall claimed she was babysitting.[8] The reports also included one domestic dispute between Hall and a male friend, another between Hall and a boyfriend, and three domestic disputes between Hall and her mother. Finally, the reports documented the Defendant's arrest for drug possession. On September 1, 2016, this Court

---

[8] Police discovered that Monet Hall's mother was actually babysitting the child. The child was located and in fine health.

10

ordered the reports unsealed.[9]  After careful review, this Court agrees with Judge Lerner's conclusion and finds that the reports contain nothing of exculpatory value, nor anything necessary for the preparation of the Defendant's case.

The Commonwealth, which depicted a naked Hall, were provided to the Defendant in pre-trial discovery.  The Defendant was not proscribed from reviewing the photographs—both standby counsel and Sharon Williams, the Defendant's investigator, were permitted to show the photographs to the Defendant in prison, but this Court proscribed the Defendant from retaining them.[10]

The Defendant claims that Detective Sierra's trial testimony contained inadmissible hearsay regarding what the victim's mother (Helena Hall) told him.  On direct examination, Detective Sierra indicated that he obtained hospital records after talking to the victim's mother, but did not repeat the contents of that conversation. N.T. 4/08/2016 at 6.  On cross-examination, the Defendant asked the detective several times why he was the only suspect and why detectives did not investigate any others. N.T. 4/08/2016 at 47–50.  The Defendant's line of questioning, again, "opened the door" for the Commonwealth to ask on re-direct why the Defendant was a suspect. *See Wharton, supra.*  The detective stated on re-direct that the Defendant was a suspect because he had learned from the victim's mother that the Defendant and the victim had a volatile relationship and that the Defendant had beaten her in the past.  This testimony was not offered to prove the truth of the matter asserted, but was in fair response to the Defendant's questioning on

---

[9] The reports were forwarded to the Defendant along with a copy of this Opinion.
[10] This Court's ruling was in accordance with 18 Pa.C.S.A. § 5903(a)(8), which states that "No person, knowing the obscene character of the materials or performances involved, shall possess any obscene material while such person is an inmate of any State correctional institution, county prison, regional prison facility or any other type of correctional facility." This policy was confirmed with counsel for the Pennsylvania Department of Corrections on November 2, 2015.

11

why detectives did not focus on other suspects. The Defendant's claim, therefore, does not warrant relief.

The Defendant claims that this Court abused its discretion when it refused to give the jury a "low-grade expert witness instruction." The Defendant argues that contradictions in the Commonwealth forensic evidence warranted the instruction. This claim is baseless as this instruction is no longer in existence.[11] The Defendant is also mistaken on this instruction's applicability. Historically, a "low-grade expert witness instruction" was used and designed "specifically for dealing with the competency of lay witnesses and psychiatrists testifying on questions of sanity." *Commonwealth v. Hernandez*, 615 A.2d 1337, 1344 (Pa. 1992). Nonetheless, this Court instructed the jury on how to appropriately weigh the expert opinions of witnesses. *See, e.g.,* N.T. 4/07/2016 at 64. For these reasons, this claim is baseless.

The Defendant argues that the method of the prosecution by the Commonwealth was malicious and in bad faith because the Commonwealth knowingly misstated the evidence and mislead the jury on Hall's time of death. He additionally claims that the Commonwealth had a duty to correct Dr. Collins' testimony after he stated that he did not know the exact time Hall died, even though his examination report stated that she died in the "early a.m." of April 4. N.T. 4/07/2016 at 207.[12]

Because Dr. Collins testified that Hall could have died on April 3, the Commonwealth did not knowingly misstate the evidence nor mislead the jury on Hall's time of death. Next, although a prosecuting attorney has a duty to correct the testimony of a witness which she knows

---

[11] The 2005 Suggested Jury Instructions eliminated the instruction.
[12] *See* further discussion on the contents of Dr. Collins' testimony and report in the facts section, *supra*.

12

to be false,[13] Dr. Collins' testimony could not in any way be characterized as false, or even misleading—the doctor offered a reasonable explanation for examination report's listed time of death. He explained that for the sake of documentation, he has to put the time of death as the date the person is *pronounced* dead (which was at or about 7:30 a.m., on April 4) because he cannot guess when the person died, if it is unknown. N.T. 4/07/2016 at 222. He further testified that he made the original assessment in his report (that Hall died in the "early a.m." on April 4) "[b]ecause that was the best information that [h]e had at the time." N.T. 4/07/2016 at 210.[14] For these reasons, these claims are meritless.

Lastly, the Defendant challenges the Third-Degree Murder verdict on weight and sufficiency grounds. He specifically argues that Dr. Collins' examination report establishes that the Defendant could not have been present at the time of the murder. In his report, Dr. Collins stated that the time and date of death was the "early a.m." on April 4, 2014. The Defendant asserts that video footage and cell phone records indicate that he left the apartment at around 8:20 p.m. on April 3 and did not return until about 7:30 a.m. the next morning. The Defendant maintains that because he called 911 minutes after arriving at the apartment on the morning of April 4, he was not there long enough to have been present when Hall's injuries occurred.

Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving each element of the crime beyond a reasonable doubt by means of wholly

---

[13] It is a well-established principle that a "prosecuting attorney has an affirmative duty to correct the testimony of a witness which he [or she] knows to be false." *Commonwealth v. Romansky*, 702 A.2d 1064, 1066 (Pa. Super. 1997) (*citing Commonwealth v. Carpenter*, 372 A.2d 806 (Pa. 1977)).

[14] Dr. Collins performed the autopsy on April 5, 2014, the day after Hall was found dead. N.T. 4/07/2016 at 204.

13

circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (*citing Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa. Super. 2010)). The fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005). The Superior Court considers all the evidence admitted, without regard to any claim of wrongly admitted evidence. *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010). The Superior Court will also not weigh the evidence or make credibility determinations. *Id.*

Weight of the evidence and sufficiency of the evidence are discrete inquiries. An argument that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict, but contends that the verdict is against the weight of the evidence. *Commonwealth v. Davis*, 799 A.2d 860, 865 (Pa. Super. 2002). An allegation that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial court. *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005) (*citing Commonwealth v. Sullivan*, 820 A.2d 795, 805–06 (Pa. Super. 2003)).

For a weight of the evidence claim to succeed, the test is whether the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Diggs*, 949 A.2d 873, 879–80 (Pa. 2008). This is a lofty standard as generally this threshold is only met when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his [or her] breath, temporarily, and causes him [or her] to almost fall from the bench; [only] then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 582 (Pa. Super. 2004) (*quoting Nudelman v. Gilbride*, 647 A.2d 233, 237 (Pa. 1994)). To determine whether this standard is met, appellate review is "limited to whether the trial judge's discretion was properly exercised, and relief will

14

only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Id.* Hence, this Court's denial of a motion for a new trial based on a weight of the evidence claim "is the least assailable of its rulings." *Id.* at 880.

Third-degree murder is when a person commits a killing that is "neither intentional nor committed during the perpetration of a felony, but contains the requisite malice. Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Commonwealth v. Morris*, 958 A.2d 569, 576 (Pa. Super. 2008) (internal citations omitted); *see also* 18 Pa.C.S. § 2502(c).

In the case at bar, sufficient evidence established that the Defendant had ample opportunity to murder Monet Hall. In spite of not knowing the precise time, Dr. Collins offered a twelve-hour window for Hall's time of death. He agreed at trial that Hall could have been beaten to death at 5 p.m. on April 3, fourteen hours before she was pronounced dead; or that she could have been beaten before 8:30 p.m. on April 3, but did not die right away. N.T. 4/07/2016 at 218–19. The Defendant acknowledges, and the video footage indicates, that he was present in the apartment at or around these times.

The evidence was more than sufficient to convict the Defendant of Third-Degree Murder. Hall was found strangled/beaten to death, lying naked on her bed, in an apartment she shared with the Defendant, who had a history of domestic abuse. The Defendant had access to that apartment as well as the opportunity to commit the crime. Following the murder, the Defendant's best friend noticed his hands were so swollen that they resembled "genetically modified chickens." Including his odd encounter with Captain Crespo after medics pronounced Hall dead, and his inculpatory statements to his cellmate, the jury had more than sufficient evidence to find him guilty beyond a reasonable doubt.

15

The Defendant's weight of the evidence claim for Third-Degree Murder also must fail, as the verdict was consistent with the evidence and a far cry from shocking one's sense of justice. The record reflects that the Commonwealth presented extensive testimony along with ample physical evidence that the Defendant—with malice—beat and killed Monet Hall. The verdict indicates that the jury chose to credit this evidence against the Defendant's theory of the case.

Finally, the Defendant claims that there was insufficient evidence for the PIC conviction for the AV cord and the flat iron. He asserts that the Commonwealth did not lay a proper foundation for their admissibility and based the PIC charge solely on the speculative opinion of Detective Crone, who was not an expert. The Defendant also maintains that his DNA found on said items could have been from any time, and not at the time of the murder, as he lived with the victim and the items were common household items.

The "admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused its discretion." *Commonwealth v. McCloskey*, 835 A.2d 801, 809 (Pa. Super. 2003) (*quoting Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998), *cert. denied*, 528 U.S. 1082 (2000)). For PIC, the Commonwealth must prove that a defendant possessed an instrument of crime with intent to employ it criminally. 18 Pa. C.S.A. § 907. An "Instrument of Crime" is: (1) anything specially made or specially adapted for criminal use; or (2) anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have. *Id.* For PIC, criminal intent can be inferred beyond a reasonable doubt from the surrounding circumstances. *Commonwealth v. Foster*, 651 A.2d 163 (Pa. Super. 1994).

At trial, Detective Crone testified that he collected the AV cord after he observed horizontal ligature marks on Hall's neck, which he believed were consistent with strangulation

16

and having some type of object wrapped around it. N.T. 4/06/2016 at 101.[15] He further observed that the marks on Hall's neck had a similar diameter as the AV cord, which was on a television stand at the foot of Hall's bed. Detective Crone said he recovered the broken flat iron inside a wastebasket next to the bed after noticing that the flat iron's shape was consistent with a unique pattern of marks on Hall's hip and buttock. N.T. 4/05/2016 at 150–51; N.T. 4/06/2016 at 100–05.

This Court instructed the jury that Detective Crone was not an expert but was testifying to what he observed. N.T. 4/06/2016 at 101. As the record clearly reflects, the detective did not offer speculative opinions about the AV cord or the flat iron; rather, he testified on why those items were retrieved from the apartment. As Detective Crone stated, a homicide detective's primary purpose, along with the Crime Scene Unit, "is to process the scene, to make all relevant observations about what is there and what might have occurred, [and to] photograph, document[,] and recover evidence." N.T. 4/06/2016 at 96.

In any event, there was more than sufficient evidence for the jury to find the Defendant guilty of PIC. Although Dr. Collins testified that he was not sure to a reasonable degree of medical certainty that the AV cord or the flat iron were used in the commission of the crime, he agreed that it was possible. N.T. 4/07/2016 at 183–84.[16] Further, the Defendant, with a history of domestic abuse, had access at the time of the murder to the room in which Hall and the instruments were found. The instruments were in close proximity to Hall's body and contained DNA consistent with that of the Defendant and Hall. Along with the unique pattern of marks on

---

[15] During Detective Crone's testimony, the jury observed photographs that illustrated marks on both sides of Hall's neck. N.T. 4/06/2016 at 100–05.

[16] Photographs of Hall illustrated that the front of her neck was spared of any marks. Dr. Collins stated that the front of her neck could have been spared because the natural thing a person would do is grab the cord from the front to protect the throat and breathing area. N.T. 4/07/2016 at 183–84.

17

Hall's neck and buttock, consistent with the AV cord and the broken flat iron, respectively, the jury had sufficient evidence to find the Defendant guilty of PIC.

For the foregoing reasons, the Defendant's judgment of sentence should be affirmed.

BY THE COURT,

Barbara A. McDermott, J

18